# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                          **Criminal Action No: 1:09CR61**

**JAMES RAMAGE,**

    **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

On the 6th day of July, 2009, came the defendant, James Ramage, in person and by Charles Berry, his attorney, and also came the United States by its Assistant United States Attorney, Zelda Wesley, for a hearing on defendant's motion to suppress, which motion was filed on June 25, 2009 (Docket Entry 13). The United States filed its response on July 2, 2009 (Docket Entry 16). The matter was referred to the undersigned United States Magistrate Judge on June 29, 2009 (Docket Entry 15).

## I. Procedural History

On October 4, 2008, defendant was arrested at his home as a result of a warrantless search which resulted in the discovery of a firearm in his home. As a result, a grand jury attending the United States District Court for the Northern District of West Virginia returned a one-count indictment against defendant on May 5, 2009, charging him with being a felon in possession of a firearm. Subsequent to defendant's May 27, 2009, arraignment, in accord with the initial scheduling order and extensions thereof, defendant filed his motion to suppress all evidence seized as a result of the warrantless search of his residence on October 4, 2008, and the fruits of all evidence, including oral and written confessions allegedly obtained from him subsequent to the

search.

## II. Contentions of the Parties

Defendant contends the warrantless search of his Marion County, West Virginia, residence, on October 4, 2008, violated his constitutional rights because:

1. The police did not have a warrant to search his residence.

2. The police did not have probable cause to search his residence.

3. No one at the residence consented to the search.

4. Even if Mrs. Ramage was deemed to have consented to the search, that consent was involuntary because the officer put her in fear for her own safety and the safety of her daughter and small grandchildren.

5. Even if Mrs. Ramage is deemed to have consented to the search, that consent was invalid because the officer informed her that he had authority to search the house due to the nature of the 911 call (a "domestic").

6. Because the subsequent interrogation of defendant was based on the illegal search and seizure, that interrogation should be suppressed as "fruits of the poisonous tree."

7. After being given his Miranda rights, defendant asked for an attorney, but was not provided one, and the interrogation continued.

8. Defendant denies that he made an oral confession, denies that he signed the Waiver of Statement of Rights, and denies that he signed the affidavit.

9. The only statement defendant made after being given his Miranda rights was to ask for an attorney.

The Government contends:

1.  Defendant's wife, Melissa Rose Ramage, voluntarily advised the officer there was a pistol in the residence and authorized the officer to retrieve the pistol.

2.  Defendant voluntarily signed both the waiver of rights form and the affidavit.

### III.  Statement of Facts

The Court received the testimony of four witnesses under oath, to wit: defendant's wife, Melissa Rose Ramage, and defendant's step-daughter, Jalysa Brooks, called by defendant; and Marion County Deputy Sheriff Christopher Gearde and ATF Special Agent Kenneth Grace, called by the Government.  The Court also admitted into evidence six exhibits, these being a handwritten affidavit; a signed Waiver of Statement of Rights; two drawings by Jalysa Brooks, made during her testimony, of the layout of the home; a photograph of the lockbox in which the gun was found; and a Marion County 911 CAD Incident Detail Report.

From the evidence presented, the Court makes the following findings of fact:

At approximately 9:17 p.m., October 4, 2008, a 911 call was logged in from defendant's neighbor (David Dayton) reporting that a man and woman were involved in a domestic dispute on Grassy Run of Marion County, West Virginia.  The 911 dispatcher noted and reported to the responding officer, Marion County Sheriff's Department Deputy Gearde, that a black male and a black female were fighting in Jamie Brummage's yard[1] but that the male had left the scene in an old red pick-up truck and was headed toward Route 310 from Grassy Run.  Deputy Gearde arrived at the scene seventeen (17) minutes after being dispatched.  His arrival was delayed because he had difficulty locating the scene of the incident and had to call the 911 dispatcher for additional

---

[1] The dispatcher's information was incorrect in the following particulars: it was a black woman and a white male who were involved instead of a black man and a black woman, and the site of the incident was the Ramage yard and not the Brummage yard.

directions. Within three (3) minutes of his arrival, Deputy Gearde met with and checked the driver's license presented by the 911 caller, David Dayton. Deputy Gearde next approached defendant's residence, shining his flashlight on the door and windows as it was dark outside. He knocked on the door and spoke first with Jalysa Brooks, who told him that her mother and her stepfather, James Ramage, had been involved in an argument, but that they were not physically fighting. Deputy Gearde asked to speak with Mrs. Ramage. Brooks then called for her mother. Melissa Rose Ramage came down stairs and talked with the officer in the hallway inside the front door of the house.[2] Melissa Ramage identified herself as the wife of James Ramage.

Melissa Ramage told Deputy Gearde that she and defendant had been involved in an five (5) to ten (10) minute long oral argument that started in the house and spilled outside into the yard. She denied any physical altercation occurred.[3] She told the officer that her husband had left and gone to a convenience store and that she had gone to the upstairs of the house to watch television. Deputy Gearde observed no injuries on Melissa Ramage. He observed no evidence of an altercation (disheveled clothing, overturned or broken furnishings) in the house. Melissa Ramage produced a driver's license as identification at the request of the deputy sheriff. After inspecting it, Deputy Gearde left the residence. Melissa Ramage testified she then returned to the upstairs area of the house. The Court concludes, from the evidence, it is likely that Melissa Ramage stayed downstairs,

---

[2]Jalysa Brooks testified that the deputy entered the house without permission as she went to call her mother from the upstairs of the house. The deputy testified he was invited into the house by Melissa Ramage when she came to talk to him at the door. No one asked the officer to leave the residence once he was inside. The officer saw no evidence and seized no evidence during this initial entry into the house.

[3]Melissa Ramage's statement to the police and in court testimony that no physical altercation occurred between her and her husband is inconsistent with his statement to the police that she hit him with a car seat. The car seat was observed by Deputy Gerarde in the yard.

4

looking out the windows into the yard to see what the police were doing. Such a conclusion is supported by the testimony of Jalysa Brooks and Deputy Gearde. [4]

Upon exiting the house, Deputy Gearde saw defendant's truck and Marion County Sheriff's Deputy Bearden's police cruiser drive into the property. Deputy Gearde approached and was privately told by Deputy Bearden that defendant was a convicted felon and suggested that Deputy Gearde should determine whether any guns were located in the residence.

Deputy Gearde had no prior knowledge of Defendant Ramage's criminal history. Deputy Gerarde had no suspicion that a firearm was in the house or had been involved in the alleged domestic disturbance he was in the process of investigating. Deputy Gerarde's overriding concern in asking if a gun was present in the house was that he did not want to permit a known convicted felon under investigation for possible domestic violence to re-enter the home where a gun was present.

> Q. Officer Gearde, did you have any rationale or reason for why, under the circumstances that you faced on the night of October 4, 2008, for going back to the house and and asking if there were any firearms present in the house?
>
> A. Other than Deputy Bearden advising me, Your Honor?
>
> Q. Yes, that was the circumstance that existed. Tell me what your rationale, your reason was once you got that information for going over to check it out.
>
> A. To make sure, since it was a domestic type situation, that nothing would have escalated after we had left the residence potentially because there was young

---

[4] Melissa Brooks testified she thought the investigation was over. Jalysa Brooks testified that her mother had only started back up the stairs when the police officer entered the house a second time and asked if there were any guns in the house. Upon approaching the house the second time, Deputy Gearde notice the two women looking out the window. The Court finds this version of the events is more believable than Melissa's Ramage's statement that she went back upstairs to watch television presumably because she believed the investigation was over. Melissa Ramage testified generally that she did not like the police presence at her home.

>           children there, Your Honor.
>
>   Q.      Is that a product of training or a product of what you view as your own
>           common sense?
>
>   A.      It's more or less, it's an unwritten policy, Your Honor, that we do certain
>           things to make sure that we're safe, that we're doing the right thing and that
>           the public is also safe. As far as when we leave the residence, we know, hey,
>           you know that there's no guns in there from what they've told us there's no
>           guns in the residence, so I mean, evidently, their disagreement was over with.

Deputy Gerarde reapproached the house.[5] The main door was open, but the screen door was closed.[6] He entered the house without knocking and again talked to Melissa Ramage.[7] The

---

[5] Melissa Ramage testified that after Deputy Gearde left the house, her husband came in and asked what the police were doing in the front yard. She testified she told him she did not know, and, if he wanted to know, he should ask the police. She further testified that he then left the house to talk to the police. Jalysa Brooks confirmed her mother's account in this regard. Deputy Gearde testified that defendant did not go to the house before talking to the police.

[6] Defendant's counsel intimated, through cross-examination of Deputy Gearde, that there was no screen door on the house; however, no photographic or other evidence was offered to establish that Deputy Gearde was incorrect about the presence of a screen door on the house on the night of October 4, 2008. Accordingly, Deputy Gerarde's testimony in this regard remains unrebutted.

[7] Melissa Ramage testified she did not invite the officer into her home at any time. She also testified that she asked why he wanted to know about guns in the house and claims the deputy sheriff told her that he needed to search her house for guns. She further testified she did not want him searching her house and asked him if he had a warrant. She testified that, in response, the deputy sheriff put his hand on his pistol in a threatening manner; said he did not need a warrant because he was investigating a domestic; and she, out of fear for herself, her daughter and grandchild, told him she had a gun in a lock box in her upstairs bedroom. Jalysa Brooks confirmed her mother's version of the conversation, except she testified Melissa Ramage told the deputy sheriff "it was ok to search the house" but did not tell him where the gun was. She also denied her mother accompanied the deputy sheriff upstairs. Instead, she claims he searched on his own for ten (10) minutes and then left the house by another set of steps and the garage exit without being observed leaving. She claims she and her mother stayed in the dining room on the first floor. Melissa Ramage contradicted her daughter's rendition of the events surrounding the search claiming that, while the deputy sheriff did go upstairs alone and searched for ten (10) or fifteen (15) minutes, he did come back down with the lock box in which she stored the gun. Deputy Gearde testified there was no talk of a search warrant. He also testified the only hesitancy Melissa Ramage expressed to his retrieving the gun from the upstairs

6

following excerpts from the digital recording of the hearing evidence establishes the police entered the Ramage residence the second time without permission:

> Q. After you and Deputy Bearden had your exchange, what did you do next?
>
> A. I then went over to the house. Deputy Bearden came back over with Mr. Ramage, which was right by his vehicle. I went up to the door and the screen door was closed but the inside door was partially open. And where they were looking out, which I assume Mrs. Ramage was looking out to see, oh he came home now and she was kinda wondering what was going on. So, I went in and asked Mrs. Ramage: "I need to ask you something. Are there any guns in the residence?" And she said, "Yes." "Where are the guns at? What type of gun is in the residence." She said, "There was a pistol in the back room in a black lock box." I said, "Do you mind if I get it?" She said, "No, I'll get it." I said, "I can't let you do that." She said, "My house is a mess." I said, "Well, will you escort me back there and I'll retrieve it?" She said, "Yeah."
>
> Q. You didn't have to open that screen door whether it was open or not, but did you have to open the other door?
>
> A. No, it was partially open.
> Q. Okay, so you just opened it on up?
>
> A. You see, they were actually at the doorway. They saw me come back to the house. 'Cause they were looking out seeing myself, Deputy Bearden and Mr. Ramage outside.
>
> Q. Were you just talking to Mrs. Ramage through that partial opening in the door?
>
> A. No, sir.
>
> Q. Where were you when you were talking to Mrs. Ramage?
> A. Inside the front doorway.

---

bedroom was that the upstairs was a mess. Deputy Gearde testified that, for officer safety reasons, he insisted on the two of them going upstairs together to retrieve the gun. He further testified he would not have known where to look for the gun had Mrs. Ramage not told and shown him where it was located. He testified his overriding concern in asking if a gun was present in the house was that he did not want to permit a known convicted felon under investigation for possible domestic violence to re-enter the home where a gun was present.

> Q. So you had stepped back inside the doorway and started asking Mrs. Ramage about the gun?
>
> A Yes, sir.

Deputy Gearde asked Melissa Ramage if there were any guns in the house. Melissa Ramage told him she had a pistol in a lock box and that she would get it for him because her upstairs room was a mess. He declined her offer and insisted on the two of them going upstairs together to retrieve the firearm. She took the deputy sheriff upstairs and pointed out the box under a bed. The deputy sheriff retrieved the box. He did not recall that it was locked and did not recall how he gained access to the inside of the box. However, he did gain access to the box in the presence of Mrs. Ramage, and no evidence of forced opening of the box was presented to the Court. Inside the box, he found a .357 revolver, which he misidentified as a Dan Smith and Wesson revolver.[8]

Deputy Gearde then exited the house with the box, firearm and ammunition. Defendant was placed under arrest at approximately 9:50 p.m. and transported to the Marion County Sheriff's Department at approximately 9:57 p.m.

The total time Deputy Gearde was in the Ramage house was approximately thirteen (13) minutes calculated as: 21:34 arrived on scene; 3 minutes to check driver's license of 911 caller = 21:37; 21:37 to 21:50 time elapsed to and from the house the first time and to and from the house the second time; defendant's arrest at 21:50; at 21:57 or approximately six to seven (6 to 7) after his arrest, defendant was transported from the scene.

Deputy Gearde contacted Special Agent Grace of BATF. Special Agent Grace arrived at the Marion County Sheriff's department and met with Defendant Ramage and Deputy Gearde in an

---

[8] The revolver is a Dan Wesson.

interrogation room. Special Agent Grace read, word for word, the contents of a Constitutional Rights and Waiver of Rights form, which defendant signed (Government Exhibit 2). Thereafter, pursuant to the waiver, Special Agent Grace interviewed defendant concerning the gun. Based on the interview, Special Agent Grace wrote notes into a statement form which he presented to defendant. After review, Defendant Ramage signed the statement (Government Exhibit 1). Both Special Agent Grace and Deputy Gearde witnessed defendant's statement and testified that defendant signed it in their presence.[9]

In the statement, defendant admits: "[T]he deputy found my .357 Dan Wesson revolver in my lock box, under my bed"; he had "got the gun about 3-4 years ago from a black male in the area of Uniontown, PA"; he had "bought the scope and bullets for it at Walmart"; "he "did load the gun"; and he "had the gun for home protection." Government Exhibit 1.[10]

### IV. Discussion

**Warrantless Entry**

The search of defendant's residence was not conducted pursuant to a warrant. The

---

[9] Defendant's wife, Melissa Ramage, and his step-daughter, Jalysa Brooks, testified they did not recognize the signatures on Government's Exhibits 1 and 2 as defendant's. Neither of them was present in the interview room at the time the documents were signed. The testimony of Melissa Ramage and Jalysa Brooks questioning whether the signatures on Government Exhibits 1 and 2 are James Ramage's signature is not persuasive because they were not present when the documents were signed, and they have a bias or interest in the outcome of the suppression motion and, thus, the case against defendant. Moreover, they do not state unequivocally that the signatures are not defendant's signatures. They only testify they were not able to recognize the signatures as those of defendant. Such testimony does not contradict the sworn testimony of the police officers who witnessed defendant's signing both documents.

[10] Melissa Ramage testified she bought the gun already fitted with the scope off the "Bulletin Board." She also testified she fired the gun, but that her husband, James Ramage, bought the bullets for the gun.

9

Government does not argue there was probable cause for the search or that there were exigent circumstances. Warrantless entries into a residence are presumptively unreasonable. The Government bears the burden of proving by a preponderance of the evidence that the entry and consequent search was justified. Payton v. New York, 445 U.S. 573 (1980).

The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." U.S. Constitution. Amendment IV. "The right to privacy in one's home is a most important interest protected by the Fourth Amendment and a continuing theme in constitutional jurisprudence." United States v. Wilhelm, 80 F.3d 116 (4th Cir. 1996). "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) *quoting* United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 2135, 32 L.Ed.2d 752 (1972). "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his home and there be free from unreasonable government intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). "Because of this heightened privacy interest, warrantless entry into an individual's home is presumptively unreasonable." United States v. Gillespie, 332 F.Supp.2d 923, 927 (WDVa 2004) citing Payton, 445 U.S. at 586, 100 S.Ct. 1371.

A warrantless search of a home may be conducted when "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

Exigent circumstances arise where "law enforcement officers confront a compelling

necessity for immediate action that would not brook the delay of obtaining a warrant." United States v. Wiggins, 192 F.Supp.2d 493, 498 (E.D.Va.2002) (*quoting* United States v. Tibolt, 72 F.3d 965, 969 (1st Cir.1995)). The government bears the burden of demonstrating the existence of exigent circumstances to overcome the presumption of unreasonableness. Welsh v. Wisconsin, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

> One exigency that is sometimes recognized by courts to excuse a warrantless search is one justified by the "emergency doctrine." *See* United States v. Moss, 963 F.2d at 678; *see also* Mincey, 437 U.S. at 392, 98 S.Ct. 2408 (finding that "the need to protect or preserve life or avoid serious injury" may justify a warrantless search of a home). "To invoke this so-called 'emergency doctrine,' the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." United States v. Moss, 963 F.2d 673, 678 (4th Cir.1992); *see also* Mincey, 437 U.S. at 392, 98 S.Ct. 2408 ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.") In addition, the Fourth Circuit has emphasized that this "emergency exigency" exception to the warrant requirement justifies "immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." Moss, 963 F.2d at 678. When analyzing whether an exigency exists, courts should give some deference to the decisions of trained law enforcement officers and avoid " 'unreasonable second guessing' of the officers' assessment of the circumstances that they faced." Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir.2002). However, courts must also analyze an officer's decision in light of the objective evidence to make sure that it is in fact reasonable. *Id.*
>
> [T]he "community caretaker" doctrine, which is very similar to the emergency doctrine, [may be used to] justify the officers' warrantless entry of the defendant's apartment. This exception to the warrant requirement allows officers who are serving as "community caretakers," protecting the safety of persons or property, to make warrantless searches. *See* Phillips v. Peddle, 7 Fed.Appx. 175, 178 (4th Cir.2001). However, two important limitations to this doctrine limit its application in general and prevent its operation in this case.
>
> First, the Supreme Court has described "community caretaking functions" as those which are " *totally divorced* from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (emphasis added). Similarly, in United States v. Gwinn, when recognizing a kind of community care-taking exception, the Fourth Circuit emphasized that an essential premise of its holding "is

11

the fact that nothing in the record suggests that [the officer's] reason for the reentry was pretextual or that he acted in bad faith." 219 F.3d 326, 335 (4th Cir.2000) (finding that officer's reentry into suspect's home to obtain suspect's shoes and shirt was not a Fourth Amendment violation).

Second, most cases that rely on the community caretaking doctrine involve the search of an automobile, and courts have been quick to point out that using it to justify warrantless entry into a home is more suspect. *See* Phillips, 7 Fed.Appx. at 178; see also Cady, 413 U.S. at 439, 93 S.Ct. 2523; United States v. Newbourn, 600 F.2d 452, 454 (1979) ("for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars"). In fact, the Supreme Court has never applied the community caretaking doctrine to justify warrantless entry of a home. *See* Wood v. Commonwealth, 27 Va.App. 21, 497 S.E.2d 484, 487 (1998) (en banc) ("[T]he Supreme Court has yet to decide whether a situation might exist that would justify a warrantless intrusion into an individual's home under the 'community caretaker doctrine,' as distinguished from an emergency or exigent circumstances."). *Cady,* the seminal decision which describes the community caretaking rationale, authorized an officer to perform a warrantless search of a vehicle, not a home. 413 U.S. at 441, 93 S.Ct. 2523 ("Local police officers... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what... may be described as community caretaking functions....").

In the few cases where courts have applied this rationale to justify the warrantless search of a home, they have emphasized that the entry was unrelated to the investigation of criminal activity. In *Phillips,* the Fourth Circuit relied on the caretaker rationale to find that it was reasonable, for § 1983 qualified immunity purposes, for an officer to enter the home of an individual who he thought was in danger for agreeing to be a witness in a criminal case. 7 Fed.Appx. at 180. However, the court emphasized that the officer "was not involved in a criminal investigative matter and left immediately upon *930 determining that Phillips was safe." *Id.* Similarly, when the Sixth Circuit relied on the community caretaking doctrine to justify the warrantless entry of police into a home in order to turn down blaring music that had woken up several neighbors in the middle of the night, the court focused on the fact that "the officers here did not enter a private home for the purpose of questioning a suspect or searching for evidence of a suspected offense."United States v. Rohrig, 98 F.3d 1506, 1521 (6th Cir.1996).

In Wood, the Virginia Court of Appeals, sitting en banc, rejected an argument that the community caretaking doctrine justified police officers' search of a home for a missing juvenile. 497 S.E.2d at 486. The court found that "the community caretaking function used to uphold a vehicle search, such as existed in *Cady,* may not be sufficient to justify an intrusion into an individual's home." Id. at 487. In addition, in that case, "the evidence indicated that the search was a 'pretext concealing an investigatory police motive,'... [therefore it] cannot be deemed a valid exercise of the community caretaking function." Id. at 488 (*quoting* South Dakota v. Opperman, 428

U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)). *Id.*

Neither the emergency doctrine or the community caretaker doctrine were asserted by the United States as justification for Deputy Gearde's second entry into the Ramage home. Even if they were, neither is applicable under the facts of this case to justify that entry into the Ramage home. Deputy Gearde did not believe any emergency or exigency existed. There was no evidence of injury to either Mrs. Ramage, her daughter, grandchild or to Mr. Ramage. There was no knowledge of any kind of a weapon being involved in the domestic dispute that apparently had ended. Had there been concern, the officers could have kept the parties separated and simply gone to the door and asked Mrs. Ramage if any weapons of any kind had been involved or were in the house.

While the officer may have had a legitimate concern that a firearm in the house could have been used in a continued husband and wife dispute after the officers left, it was only after fellow deputy had told him that Ramage was a convicted felon and he ought to check to see if a gun was present that he returned to the house, entered it and asked Melissa Ramage is there were any guns in the house. That smacks of investigation of criminal activity as opposed to community caretaking.

Accordingly, the Court finds that Deputy Gearde's second entry across the front door threshold into the Ramage home was in violation, but not a flagrant violation, of defendant's Fourth Amendment Rights.

**Consent to Search**

It is undisputed that Mrs. Ramage had the actual authority to consent to the search.

A search conducted pursuant to valid consent is a well-recognized exception to the Fourth

Amendment's general warrant requirement. Shneckloth v. Bustamente, 412 U.S. 218 (1973). Whether consent to search was given is a factual issue to be determined by this Court in light of all the circumstances. United States v. Mendenhall, 446 U.S. 544 (1980); United States v. Vickers, 387 F.2d 703 (4th Cir. 1967) citing Channel v. United States, 285 F.2d 217 (4th Cir. 1960), United States v. Rusher, 966 F.2d 868 (4th Cir. 1992). That factual determination will not be disturbed unless it is clearly erroneous. United States v. Gordon, 895 F.2d 932 (4th Cir. 1990).

Based on the foregoing factual findings, the Court concludes that Melissa Ramage gave Deputy Gearde consent to search for the firearm. The Court further concludes that she accompanied the officer to the bedroom area of the house and directed him to the lock box wherein the gun and ammunition were stored under her bed.

**Validity of Consent**

Defendant also contends that even if Mrs. Ramage in some manner consented to the search of her residence, that search was not voluntary. The voluntariness of consent to search is a factual question to be determined in light of the totality of the circumstances, and should be upheld unless clearly erroneous. United States v. Gordon, 895 F.2d 932, 938 (4th Cir.) cert. denied 111 S.Ct. 131 (1990). If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); United States v. Beckner, 473 F.3d 551 (4th Cir. 2007).

A consent to search is valid if the government can "demonstrate the consent was, in fact, voluntarily given, and not the result of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). As in the issue of whether consent was given at all, the

determination of whether a consent to search is valid is based upon the "totality of the circumstances." Id. at 227. Some of the factors which may be used in determining whether a consent to search was voluntary include: the consenter's age, education, maturity, intelligence, and experience, as well as the conditions under which the consent to search was given, such as the officer's conduct, the number of officers present, and the duration, location, and time of the encounter. United States v. Elie, 111 F.3d 1135 (4th Cir. 1997).

From the record in this case, it clearly appears that Mrs. Ramage is a mature adult; that she had actual authority to consent to the search; and that she was coherent. There was only one officer present in the house, and the event took place in Mrs. Ramage's own home at about 9:00 p.m..

Defendant argues, however, that, if Mrs. Ramage consented in any manner, it was due to the officer's conduct. Defendant contends that the officer Gearde placed his hand on his gun in a threatening manner.

Although consent must be knowing and voluntary, the government is not required to show that an individual was told or otherwise knew he had the right to refuse consent. *See*, e.g., Ohio v. Robinette, 519 U.S. 33 (1996). "Neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused established involuntariness in and of itself." Elie, 11 F.3d at 1145-46. On the other hand, consent must be more than mere acquiescence to apparently lawful authority. Bumper v. North Carolina, 391 U.S. 543 (1968).

Where consent to search is given following an unlawful entry or arrest, there is a strong possibility that the consent will be found invalid. *See*, e.g., Florida v. Royer, 460 U.S. 491 (1983).

In the instant case, for the reasons set forth herein, the Court finds the testimony of Melissa

15

Ramage on the issue of the voluntariness of her consent to search not credible. Her own daughter testified that Melissa Ramage told the officer it was "ok" for him to search for the gun. The daughter and the mother each testified the search was conducted alone by the officer and that it took ten (10) minutes or more for the search to be conducted. If it took ten (10) minutes or more for the officer to search and find the weapon, according to the time line herein set forth, only three (3) minutes or so was left for the officer to approach the house, enter and talk with Mrs. Ramage and her daughter the first time and then leave talk to Defendant Ramage and the other officer and then return to the house a second time and ask about the gun. It is more likely that Melissa Ramage consented and took Deputy Gearde to the upstairs bedroom and showed him the location of the box and gun.

**Attenuation and Intervening Actions and Flagrancy of the Misconduct**

The physical evidence obtained during the unlawful second entry into the Ramage home and subsequent statement of defendant must be suppressed unless "the evidence . . . was obtained after an intervening 'act of free will [sufficient] to purge the primary taint of the unlawful invasion" and the subsequent consent to search. United States v. Gillespie, 332 F.Supp.2d 923, 931 (D.C. W.D. Va. 2004) citing Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

There are three factors that are relevant and which must be considered by the Court in determining whether the primary taint has been purged: " 1) the amount of time between the illegal action and the acquisition of the evidence; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." Id. citing Brown v. Illinois, 422 U.S. 590, 604-604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). "The burden of showing admissibility rests ... on the prosecution." United States v. Seidman, 156 F.3d 542, 548 (4th Cir. 1998).

Applying the first Brown factor, very little time could have elapsed between Deputy Gearde's unlawful entry into the Ramage home and when Mrs. Ramage escorted him to the upstairs bedroom and showed him where the gun was located. However, suppression is not necessarily warranted in the face of the lack of a significant intervening period of time. "[T]he Brown test does not require that each of the factors set forth be resolved in favor of the Government." United States v. Wellins, 654 F.2d 550, 554 (9th Cir. 1981). This is particularly the case where as here the second and third factors weigh heavily in favor of admissibility.

With respect to the second Brown factor, Melissa Ramage's actions in regard to Deputy Gearde and the gun after the unlawful entry constitute significant intervening circumstances. She was engaged in conversation with Deputy Gearde concerning whether a gun was located in the residence. She indicated to the deputy sheriff that a gun was in a box in her bedroom. When the deputy sheriff asked if her if he could go retrieve it, she declined reasoning that her house was a mess. When the deputy sheriff insisted and suggested they go together, she agreed by leading him upstairs directly to the box and gun under the bed. After the unlawful entry into the home, Melissa Ramage never once asked the deputy sheriff to leave.

Finally, with respect to the third Brown factor, the evidence shows that Deputy Gearde only opened the screen door and stepped across the threshold of the Ramage front door to engage the two women who had been watching the events outside through the front windows. While the purpose of coming back and entering the house was to assure that a firearm was not present, the deputy was still processing a domestic call; did not want the husband returning to the house if a firearm was present for fear that the initial dispute would again flare up and deteriorate into a violent episode; and did not have any knowledge or reasonable suspicion that a gun was present. The entry was not

17

made for the purpose of retrieving a firearm that Deputy Gearde had earlier been told was present (when he first talked to Mrs. Ramage) but did not seek to seize until he later learned from his fellow deputy that Defendant Ramage was a convicted felon prohibited from possessing a firearm. The second entry was not made in flagrant disregard of Defendant's Fourth Amendment rights.

Accordingly, the Court concludes that the United States has carried its burden of proving that the evidence discovered (the scoped gun and ammunition) was acquired "sufficiently independent of the unlawful invasion to purge any taint arising from the initial entry." United States v. Seidman, *supra* at 549-550.

**Waiver of Rights and Affidavit**

Defendant also argues that after he was Mirandized, he requested an attorney but interrogation continued without an attorney. He also argues that he made no statements except for his request for an attorney and that he did not sign the waiver of rights form or the affidavit.

"Once the right to counsel is asserted, a subject in custody may not be interrogated outside counsel's presence "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477 (1981).

Defendant does not argue that his statements, if any, were involuntary, but instead argues that he never made any statement at all, with the exception of his request for an attorney. He asserts that he never signed the Waiver of Rights form and that he did not make an oral statement or sign the written Affidavit. In light of the signed statement of rights waiver form and the signed statement, Defendant's assertions are unsupported by evidence, contrary to existing unrebutted fact and not credible.

## V.  Recommendation

For the reasons herein stated, the undersigned accordingly recommends defendant's motion to suppress (Docket Entry 13) be **DENIED**.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.  Failure to timely file objections to the Proposed Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 13day of July, 2009.

*John S. Kaull*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE